IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00160-MEH

CATHOLIC HEALTH INITIATIVES PHYSICIAN SERVICES, LLC,

    Plaintiff/Counter Defendant,

v.

MEDSYNERGIES, LLC,

    Defendant/Counter Claimant/Third-Party Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES,

    Third-Party Defendant.

# ORDER

**Michael E. Hegarty, United States Magistrate Judge.**

    Plaintiff Catholic Health Initiatives Physician Services, LLC ("Plaintiff") initiated this action in District Court, County of Denver, Colorado, on August 18, 2017. MedSynergies, LLC ("Defendant") removed the action to this Court on January 19, 2018, pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446(b)(3). Defendant now files the present Partial Motion to Dismiss two of the three claims Plaintiff asserts against it in the operative Complaint. Following review of the motion and briefing, the Court finds Plaintiff has plausibly stated a claim for breach of the implied covenant of good faith and fair dealing but fails to do so for its unjust enrichment claim. Therefore, the motion is granted in part and denied in part.

# BACKGROUND

**I.     Facts**

The following are factual allegations made by Plaintiff in the operative Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Catholic Health Initiatives[1] ("CHI") is a Colorado faith-based nonprofit corporation that operates 104 healthcare facilities in seventeen states. Compl. ¶¶ 4, 10, ECF No. 5. It has over 90,000 employees, of whom approximately 4,300 are physicians. *Id.* ¶ 10. Prior to 2012, CHI invested significant resources seeking to increase efficiency and decrease costs by standardizing the process CHI's physician groups used to manage their revenue cycles. *Id.* ¶¶ 11–12, 17. After some exploratory period, CHI retained Defendant to conduct financial and operational assessments of five of its physician groups. *Id.* ¶ 13. After the assessment, Defendant reported that it could increase cash collections by $50 million annually in those five locations. *Id.* ¶ 17. Based on this assessment, CHI and Defendant entered into a joint venture in which those parties formed Plaintiff,[2] and Plaintiff and Defendant entered into a contractual relationship (a Master Service Agreement ("MSA") and Statement of Work ("SOW")) in which Plaintiff agreed that Defendant would be the exclusive provider of revenue cycle services to each of CHI's physician enterprises. *Id.* ¶¶ 1, 17–19.

Under the terms of the MSA, Plaintiff would pay Defendant an implementation fee of up to

---

[1] CHI is a third-party Defendant to this lawsuit. *See* ECF No. 7.

[2] While Plaintiff was a joint venture between CHI and Defendant when the parties originally contracted to enter into the MSA, on December 27, 2017, CHI exercised its option to purchase Defendant's ownership interest in Plaintiff created by the termination of the MSA. Notice of Removal ¶¶ 14–15, ECF No. 1. CHI is now the sole member of Plaintiff. *Id.* ¶ 20.

$8 million as well as 11.94% of the proceeds Plaintiff received from the physician enterprises. *Id.* ¶ 22. For its end, Defendant agreed to a performance guarantee of a $100 million increase in revenue after three years, measured against a pre-agreement baseline, and Defendant's fee could increase or decrease based on the revenue cycle performance in relation to that guarantee. *Id.* ¶¶ 24–27; Ex. B at 97, ECF No. 3. While the MSA tied Defendant's fee to revenue performance in relation to the guarantee, the MSA did not always specify the "Service Level" standards to monitor Defendant's performance. Compl. ¶¶ 26–27, 58.

The parties then began implementing Defendant's services at CHI providers. Defendant's revenue cycle operations began going "live" in CHI facilities in January 2014 and continued to reach additional markets in 2015. *Id.* ¶¶ 29–30. However, the parties eventually discovered that CHI revenue decreased under Defendant's services as compared to the baseline. *Id.* ¶ 31. Defendant's performance did not improve in 2015. *Id.* ¶ 33. In late 2015, Defendant stopped reporting its collection performance against the contractual baseline. *Id.*

In early 2016, both parties' management met to discuss revised performance metrics and updated goals. *Id.* ¶ 34. Subsequent meetings failed to produce an agreement. *Id.* ¶¶ 34–37. On June 8, 2017, Plaintiff notified Defendant that it was terminating the agreement on the grounds of Defendant's material breaches of its duties. *Id.* ¶ 49. As of April 2017, Plaintiff had paid Defendant over $325 million in fees and expected to pay approximately $90 million more by the end of 2017. *Id.* ¶ 50. This suit followed.

## II.    Procedural History

Plaintiff filed its Complaint in Colorado state court on August 18, 2017. Compl. 1, ECF No. 5. Defendant removed the suit to this Court on January 19, 2017. Notice of Removal, ECF No. 1.

In its Complaint, Plaintiff brought three claims for relief: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) unjust enrichment. Defendant now asks the court to dismiss Claims Two and Three, because Plaintiff has failed to plausibly state a claim for relief for those claims. Mot., ECF No. 23.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678–80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a

4

complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## ANALYSIS

Defendant now moves to dismiss Claims Two and Three. The Court will resolve the dispute applying the law of Delaware, as stipulated in the MSA. Ex. B ¶ 28, ECF No. 3.

**I.       Breach of Implied Covenant of Good Faith and Fair Dealing**

Defendant argues Plaintiff's allegations fail to state a claim for breach of the implied covenant of good faith and fair dealing. Under Delaware law, "[t]he implied covenant of good faith and fair dealing inheres in every contract and 'requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain.'" *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.

2005)).  However, "[t]he implied covenant . . . cannot properly be applied to give [a] plaintiff[] contractual protections that '[it] failed to secure for [itself] at the bargaining table,'" *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)), and therefore "cannot be invoked to override the express terms of the contract[,]" *Kuroda*, 971 A.2d at 888.  "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."  *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440 (Del. Ch. 2012)), *overruled on other grounds by Winshall*, 76 A.3d at 815.

To state a claim for relief for a breach of the implied covenant, a party must allege "(1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff."  *Id.* (numbering added).  "Applying the implied covenant is a 'cautious enterprise' and [a court] will only infer 'contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."  *Gerber*, 67 A.3d at 421 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).  "Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully."  *Kuroda*, 971 A.2d at 888.

Here, Plaintiff argues it has plausibly stated a claim for relief for a breach of an implied covenant by alleging Defendant did not "work in good faith—reasonably and non-arbitrarily—to evaluate its performance consistent with the parties' overall agreement." Resp. 5–6, ECF No. 24. Applying Delaware law, and respectful of the state's guidance that the "implied covenant is only rarely invoked successfully," *Kuroda*, 971 A.2d at 888, the Court agrees.

Plaintiff makes four allegations that support this claim. First, Plaintiff alleges that the fees it was contractually obligated to pay Defendant for its services were tied to its revenue and whether that revenue satisfied a performance guarantee of a $100 million improvement over a contractually negotiated baseline. Compl. ¶¶ 25–26; Ex. B at 97, ECF No. 3. Second, Plaintiff alleges the MSA "did not sometimes set forth specific Service Level standards to monitor [Defendant's] performance . . . ." Compl. ¶ 58. In the absence of this defined standard, Plaintiff alleges "[Defendant] had an obligation to work . . . in a reasonable and non-arbitrary way to evaluate its performance against pre-transition and nationally recognized . . . performance level standards as would be reasonably expected based upon the promises made by [Defendant] at [the] time of contracting." *Id.* Third, Plaintiff alleges "[Defendant] . . . has refused to evaluate its performance of the promises it made in the [MSA] in a reasonable manner," *id.* ¶ 59, and that eventually "[Defendant's] revenue cycle management performance deteriorated so much that [it] unilaterally stopped reporting in late 2015 its collections performance against the agreed-to baseline performance[,]" *id.* ¶ 33. Finally, Plaintiff alleges Defendant's conduct has "prevented [Plaintiff] from receiving the benefit of the bargain it made." *Id.* ¶ 59.

Applying these allegations, taken as true, to the elements of breach of implied covenant of good faith and fair dealing, the Court finds Plaintiff has plausibly stated a claim for relief. The first element requires a plaintiff to allege a contracting party had "a specific implied contractual obligation." *Kuroda*, 971 A.2d at 888. Plaintiff alleges Defendant had an implied obligation to calculate its performance relative to the MSA performance goal in a reasonable manner. Compl. ¶¶ 58–59. The second element is "a breach of that obligation by the defendant." *Kuroda*, 971 A.2d at 888. Plaintiff alleges "[Defendant's] revenue cycle management performance deteriorated so

7

much that [it] unilaterally stopped reporting in late 2015 its collections performance against the agreed-to baseline performance." Compl. ¶ 33. The final element requires that the breach "result[s] [in] damage to the plaintiff." *Kuroda*, 971 A.2d at 888. Plaintiff satisfies this requirement also, alleging, "[by] refusing to evaluate its performance of the promises it made in the [MSA] in a reasonable manner, [Defendant] has thus prevented [Plaintiff] from receiving the benefit of the bargain it made." Compl. ¶ 59. Plaintiff has plausibly stated a claim for breach of the implied covenant in Delaware.

This conclusion does not conflict with Delaware's directive that "[t]he implied covenant cannot be invoked to override the express terms of the contract." *Kuroda*, 971 A.2d at 888. Here, an implied obligation to reasonably and non-arbitrarily evaluate its performance against the pre-transition levels does not override any express term of the MSA or SOW. Plaintiff alleges the MSA "did not sometimes set forth specific Service Level standards to monitor [Defendant's] performance . . . ." Compl. ¶ 58. Therefore, an implied covenant to reasonably and non-arbitrarily evaluate its performance would fill a "gap" in the MSA and SOW. *Gerber*, 67 A.3d at 421 ("[A court] will only infer 'contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" (quoting *Nemec*, 991 A.2d at 1125)). To rebut this argument, Defendant argues "the contract expressly provides mechanisms to evaluate the parties' respective performance, such as through evaluation of the Service Level metrics and the Performance Guarantee." Mot. 7, ECF No. 23. This argument misses the mark. Plaintiff's implied covenant claim is not based on Defendant's alleged failure to satisfy the performance guarantee. Instead, Plaintiff alleges that "the [MSA] sometimes did not set forth specific Service Level standards to *monitor* [Defendant's] performance," Compl. ¶ 58 (emphasis added), and "[Defendant] . . . has refused to evaluate its

8

performance of the promises it made in the [MSA] in a reasonable manner . . . [,]" *id.* ¶ 59. Further supporting the claim, Plaintiff alleges Defendant's "revenue management performance deteriorated so much that [Defendant] unilaterally stopped reporting in late 2015 its collections performance against the agreed-to baseline performance." *Id.* ¶ 33. The Court is persuaded that Plaintiff has sufficiently alleged a "gap" in the MSA: that it did not always specify how Defendant's performance would be measured. Further, the Court is persuaded that the parties would have agreed that Defendant must measure its performance reasonably and non-arbitrarily had they thought to negotiate it at the time of contract. *Gerber*, 67 A.3d at 418 ("The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them.").

The Delaware Supreme Court's decision in *Gerber* provides an example of a "gap" in a contract that implicates the implied covenant of good faith and fair dealing. In *Gerber*, a provision in an LLC's limited partnership agreement ("LPA") permitted the general partner to undertake certain transactions presumed to be within the restrictions of the LPA if the general partner sought the protection of a "safe harbor" provision. *Id.* at 409–10. In the case, a former unit holder of the LLC sought to challenge transactions made by the general partner even though the general partner made the transactions having satisfied the safe harbor requirements. *Id.* at 408–09. To support a claim for breach of the implied covenant of good faith and fair dealing, the plaintiff alleged facts that the general partner sought the protection of the safe harbor in bad faith. *Id.* at 412. The Delaware Supreme Court found that the plaintiff had stated a claim for breach of the implied covenant, because an implied term in the LPA required the general partner satisfy the safe harbor in good faith. *Id.* at 425.

Here, Plaintiff alleges that Defendant's performance of its contractual duties would be satisfied by meeting a "Performance Guarantee" established in the SOW. However, Plaintiff alleges the MSA "did not sometimes set forth specific Service Level standards to monitor [Defendant's] performance . . . ." Compl. ¶ 58. Plaintiff alleges Defendant "had an obligation to work with [Plaintiff] in a reasonable and non-arbitrary way to evaluate is performance" under the MSA. *Id.* Thus like the "gap" in the contract in *Gerber* (requirement that the general partner seek the safe harbor provision in good faith), Plaintiff alleges a gap existed in the MSA ("the [MSA] did not sometimes set forth specific Service Level standards to monitor [Defendant's] performance . . . ."). *Id.* ¶ 58. Plaintiff alleges Defendant had an implied duty to measure its performance against the baseline in a non-arbitrary and reasonable manner, and Defendant failed to do so. *Id.* ¶¶ 58–59. The Court is persuaded that Plaintiff has plausibly stated a claim for breach of the implied covenant.

Defendant's final argument to support dismissal suggests that the Court should not read a reasonableness requirement into the MSA, because both parties to the transaction are sophisticated. Mot. 7–8; Reply 5–6, ECF No. 25. To support this argument, Defendant cites to *Superior Vision Services, Inc. v. ReliaStar Life Insurance Co.*, No. Civ.A. 1668-N, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006). There, a corporation entered into a series of stock purchase agreements which contained a provision that prohibited it from issuing dividends on its stock unless two-thirds of its shareholders waived the provision. *Id.* at *1. Eventually, the corporation sought to issue dividends, but a majority shareholder that owned forty-four percent of the stock refused to waive the provision and permit the dividends. *Id.* The corporation brought suit seeking declaratory judgment that the shareholder breached the implied covenant of good faith and fair dealing by unreasonably withholding its consent to waive the dividend provision. *Id.* at *2, 5.

The court rejected the corporation's argument that the waiver provision impliedly contained a covenant that the shareholder's consent could not be unreasonably withheld. *Id.* at *6–7. The court noted the agreement "explicitly prohibited" the corporation from issuing dividends without the waiver of two-thirds of the shareholders. *Id.* at *6. As such, implying a term that a shareholder could not unreasonably refuse to waive the dividend provision would override an express term in the contract. *Id.* While the court recognized that "[a] court should not read a reasonableness requirement into a contract entered into by two sophisticated parties," *id.*, the fact that both parties were sophisticated did not legally eliminate the implied covenant. The court explicitly recognized that "[u]nder Delaware law, *every contract* includes an implied covenant of good faith and fair dealing . . . ." *Id.* (emphasis added). However, the court dismissed the claim, because the asserted implied covenant would violate an express term of the contract. *Id.* In other words, the contract did not contain a "gap" for the implied covenant to fill.

Here, Plaintiff alleges such a gap, and an implied covenant would not override any express term in the MSA. As such, Plaintiff has plausibly stated a claim for breach of the implied covenant of good faith and fair dealing. The Court therefore denies Defendant's motion as to this claim.

## II.   Unjust Enrichment

Defendant also argues Plaintiff's claim for unjust enrichment should be dismissed, because a valid contract governs Plaintiff's claims. In Delaware,[3] the elements of unjust enrichment are: "(1)

---

[3] The Court does not address Plaintiff's argument that Colorado law for unjust enrichment applies. In Colorado state court, Plaintiff argued that because alternative pleading is a matter of procedure, Colorado substantive law applied to its unjust enrichment claim. Resp. 6–7, ECF No. 24. While this was a doubtful argument in Colorado, it has no merit here. Colorado procedural law has no applicability in federal court. *Budinich v. Becton Dickinson & Co.*, 807 F.2d 155, 158 (10th Cir. 1986) ("[M]atters of procedure are controlled by federal law.").

an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification[,] and (5) the absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999). "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim. . . . [W]hen the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed." *Kuroda*, 971 A.2d at 891 (third alteration in original); *James v. United Med. LLC*, No. N16C-06-209 AML, 2017 WL 1224513, at *7 (Del. Super. Ct. Mar. 31, 2017) ("Courts developed unjust enrichment . . . as a theory of recovery to remedy the absence of a formal contract, and . . . [a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." (third alteration in original) (quoting *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, No. N12C-09-094 JTV, 2013 WL 5210255, at *11 (Del. Super. Ct. Sept. 4, 2013))).

Here, Plaintiff alleges an express, enforceable contract controls the parties' relationship. Compl. ¶¶ 17–27, ECF No. 5; *see* Ex. B, ECF No. 3. Nevertheless, Plaintiff argues the Court should allow the claim to proceed, because "Delaware courts frequently allow alternative claims for unjust enrichment [despite simultaneously bringing a breach of contract claim]." Resp. 7, ECF No. 24. To support this argument, Plaintiff cites to various decisions by Delaware courts that allowed a plaintiff to bring an unjust enrichment claim as an alternative to a breach of contract claim. Defendant responds by arguing that Plaintiff's cases are inapplicable, because the validity of the contract was in dispute in those cases. Reply 8, ECF No. 25. The Court agrees with Defendant.

A plaintiff "may plead unjust enrichment in the alternative to his breach of contract claim . . .

only . . . 'when there is doubt surrounding the enforceability or the existence of the contract.'" *Khushaim v. Tullow Inc.*, No. N15C-11-212-PRW, 2016 WL 3594752, at *8 (Del. Super. Ct. June 27, 2016) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005)). The cases to which Plaintiff cites are merely consistent with this proposition.[4] *See Se. Chester Cty. Refuse Auth. v. BFI Waste Servs. of Penn., LLC*, No. K14C-06-016 JJC, 2015 WL 3528260, at *3–5 & n.24 (Del. Super. Ct. June 1, 2015) (permitting an unjust enrichment claim alternative to a breach of contract claim but recognizing it is proper "only when there is doubt surrounding the enforceability or the existence of the contract"); *Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable v. Wachovia Bank of Del. Nat'l Ass'n*, No. 10-520 (JBS/KMW), 2011 WL 6650329, at *13 (D. Del. Dec. 21, 2011) (permitting an unjust enrichment claim to continue where the plaintiff's "contract claim as a third-party beneficiary may not be meritorious in the end, and therefore the possibility for pleading unjust enrichment as an alternative should not be ruled out"), *rev'd in part on reconsideration by* No. 10-520-RGA, 2012 WL 3150386 (D. Del. Aug. 2, 2012). These cases do not disturb Delaware law that "when the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed." *Kuroda*, 971 A.2d at 891 (alteration in original). Because Plaintiff alleges the parties' dispute is controlled by an express, enforceable

---

[4] Plaintiff also cites to *In re FAH Liquidating Corp.*, 572 B.R. 117, 131 (Bankr. D. Del. 2017) for the proposition that "[i]t is also well established that a plaintiff may plead alternative claims for relief even where the pleading contains claims for breach of contract and unjust enrichment." The Court declines to follow this decision for several reasons. First, it is contrary to the clear weight of authority in Delaware. Second, as a federal bankruptcy decision, it is not highly persuasive in interpreting Delaware law. Finally, the plaintiff in that case did not bring a breach of contract claim, so the court's statement is merely dicta. The Court will follow established Delaware law that a party may not bring an alternative unjust enrichment claim simultaneously with a breach of contract claim when the validity of the contract is not in dispute.

contract, its unjust enrichment claim must fail.

Plaintiff's final argument again relies on the alleged "gaps" in the MSA and argues these allegations permit pleading an unjust enrichment claim in the alternative to a breach of contract claim. Resp. 8–9. The Court does not agree. Plaintiff cites to, and the Court has found, no Delaware case permitting a party to bring an unjust enrichment claim as an alternative to a breach of contract claim, because the contract contains alleged gaps. The cases to which Plaintiff cites are consistent with the proposition that such pleading is only proper when the validity of the contract is in dispute. *Se. Chester Cty.*, 2015 WL 3528260, at *5 (permitting an unjust enrichment claim to proceed, because "if [the plaintiff's] breach of contract claim would be held unavailable, there would be an absence of a remedy provided by law"). Because Plaintiff alleges its remedy is controlled by a valid contract, its unjust enrichment claim must be dismissed.

## CONCLUSION

Here, Plaintiff has plausibly alleged a claim for a breach of the implied covenant of good faith and fair dealing, and the Court denies Defendant's motion to dismiss that claim. However, Plaintiff's unjust enrichment claim is improper, because Plaintiff's legal remedy is controlled by the MSA and SOW. Therefore, the Court grants Defendant's motion to dismiss this claim. Accordingly, Defendant's Partial Motion to Dismiss [filed February 2, 2018; ECF No. 23] is **granted in part and denied in part**.

Entered and dated this 10th day of April, 2018, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge